UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CIVIL ACTION 08-893 |
| VERSUS | JUDGE HAIK |
| CITGO PETROLEUM CORPORATION | MAGISTRATE JUDGE HANNA |

## REASONS FOR JUDGMENT

Trial in this matter was held in Lafayette, Louisiana beginning on March 21, 2011 and concluding on April 1, 2011. A Judgment with reasons was filed on September 29, 2011. Appeals to the Fifth Circuit Court of Appeals were taken by both the United States of America ("United States") and Citgo Petroleum Corporation ("Citgo"). On September 11, 2013, the appellate court issued its judgment vacating the civil penalty award imposed by this Court and remanding the matter for further proceedings. Specifically, this Court was ordered to reassess the issues of economic benefit and the civil penalty. The appellate court also suggested this Court reexamine the issue of gross negligence and Citgo's history of prior violations in light of that reevaluation, without directly reversing the finding of ordinary negligence, but instead made no ruling on the issue.

This judgment addresses only those issues raised by the appellate court. The original judgment stands in all respects not addressed herein. A full recitation of the facts and procedural history of this case is unnecessary as both the parties and all Courts involved are familiar with same.

1

## FINDINGS OF THE APPELLATE COURT

In its ruling, the Fifth Circuit focused on the factors to be considered in awarding a civil penalty under the CWA, noting a court's analysis of those factors is highly discretionary. Despite this, the appellate court found this Court failed to "quantify the economic benefit to CITGO of deferring for nearly a decade its response to the known deficiencies at its Lake Charles plant" and directed this Court to "consider its analysis of the factors afresh after making a reasonable approximation of economic benefit."

In its original judgment, this Court did not quantify the economic gain to Citgo, finding it virtually impossible to do so given the evidence. Instead, it was held "the amount of gain to Citgo was less than the $83 million argued by the government, but more than the $719.00 asserted by Citgo." The Fifth Circuit stated, "In this case, based on Citgo's history of avoiding corrective actions for years, we find it particularly inappropriate not to have made an estimate, though admittedly difficult, of the economic benefit."

With respect to negligence, the appellate court declined ruling on the issue, instead suggesting this Court "reconsider all its findings with respect to Citgo's conduct, giving special attention to what Citgo knew prior to the oil spill and its delays in addressing recognized deficiencies." The appellate court further ordered a re-evaluation of Citgo's prior violations in light of the foregoing.

2

## CLEAN WATER ACT

Under the Clean Water Act, 33 USC section 1251, the following factors are to be considered when determining a civil penalty:

1. The seriousness of the violation or violations.

2. The economic benefit of the violator, if any, resulting from the violation.

3. The degree of culpability involved.

4. Any other penalty for the same incident.

5. Any history of prior violations.

6. The nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge.

7. The economic impact of the penalty on the violator.

8. Any other matters as justice may require.

33 U.S.C. A. Section 1321(b)(7)(A) states, "any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of Paragraph 3, shall be subject to a civil penalty..." Liability can reach $1,100.00 per barrel of oil discharged or a per day violation rate of up to $32,500.00. The Court is allowed wide discretion when considering the factors and the penalty amount.

For purposes of this remand, the economic benefit factor will be examined first, then the remaining factors, as necessary.

**ECONOMIC BENEFIT**

As noted by the Fifth Circuit, "Thought the 'violation' in its most limited sense was the oil spill from which Citgo obtained no economic benefit, such a narrow reading of this statutory factor is inconsistent with the manner in which other courts have interpreted the requirement. Generally, courts consider the financial benefit to the offender of delaying capital expenditures and maintenance costs on pollution control equipment." Citing *United States v. Smithfield Foods, Inc.*, 191 F.3d. 516 (4th Cir., 1999); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d. 1128 (11th Cir., 1990). Further guidance comes from *United States v. Allegheny Ludlum Corp.*, 366 F.3d. 164 (3rd. Cir., 2004) which concluded the general approaches to calculating economic benefit as: "(1) the cost of capital, i.e., what it would cost the polluter to obtain the funds necessary to install the equipment necessary to correct the violation; and (2) the actual return on capital, i.e., what the polluter earned on the capital that it declined to divert for installation of the equipment."

As for the actual determination of the economic benefit, the amount of the civil penalty must also be set. Although the Fifth Circuit does not prescribe one method or another for making the determination, it does conclude "the district court generally must make a reasonable approximation of economic benefit when calculating a penalty under the CWA."

Citgo argues in its post-appeal brief that the calculations set forth by the United States are legally and factually flawed as they are not the least-cost calculation required by law. Citgo contends the focus should be on the least cost means of preventing the spill and the government failed to present evidence as to this essential calculation. Further, Citgo contends the United States used an inflated discount rate. In its Post-Appeal Brief, Citgo sets out alternative

4

calculation theories, concluding the amount of economic benefit ranges from $719.00 to $14.7 million. Using the CWA's five year limitations period, and accepting all of the contentions of the United States as true, Citgo notes the penalty may amount to $20,116,640.00.

The government contends the amount of economic benefit is $114.2 million. The United States notes this Court has already determined Citgo gained financially from its failures and delays in implementing ways to prevent the spill. That ruling stands and is affirmed by the appellate court which noted, "Citgo had decided to forgo certain maintenance projects that would have prevented the spill in an effort to minimize costs and increase profits." The United States further contends there are five essential parts to determining economic benefit and four have already been addressed. With respect to the first, it has been decided the "avoided and delayed cost" method will be used to determine the economic benefit. In determining what actions were delayed or avoided, the injunctive relief ordered demonstrated what equipment should have been installed earlier to prevent the spill. Specifically, the third and fourth wastewater tanks, at least one API separator, and an aeration tank were delayed. The Court ordered all to be installed except the Third tank, which had been completed about a year and a half after the spill. As for the avoided items, the government argues certain costs have been completely avoided. Specifically, the government cites evidence showing Citgo avoided at least $2.7 million between the years 2000 and 2007 by failing to remove oily sludge from the wastewater storage tanks. Further, the government notes Citgo's corporate representative admitted at trial that they saved a separate $2.5 million per year in avoided waste disposal costs from this failure to remove. These amounts should be included in a finding of economic benefit.

Thirdly, the unit costs must be determined. The United States notes the amounts it set out were derived from Citgo documents and are undisputed. That is, the third and fourth tanks cost $15.65 each, the API separator costs $1.726, the aeration tank costs $5 million, the sludge removal would have cost $2.7 million between 2000 and 2007, and the sludge disposal would amount to $2.5 million per year for that same time period. As to the fourth element, the present day value of the delayed and avoided costs, this Court has already stated the 10.04 rate adopted by Mr. Harris was reasonable, if not low. *(Trial Transcript at 1168:12-19)*

Citgo contends this calculation offered by the government is not "least cost". Citgo asserts the least costly way of preventing the spill would have been by restoring oil skimming operations on the storage tanks and sealing the junction box in 2005 at a cost of $719. The government, however, cited the testimony of Mr. Amendola, who noted the action urged by the government was the "lowest cost alternatives for Citgo."

With regard to the final element, the economic benefit period, the government contends it should run from May 31, 1994, when operations began or, at the latest October 31, 1996, when Citgo's managers formally requested more tank storage capacity due to inadequate capacity during rain events. Citgo's own documents show its staff requested storage of 44 million gallons in 1992 (4 storage tanks), but Citgo management chose to build only enough for 25 million gallons of capacity. This was done in an effort to cut cots. Citgo's own internal documents cited by the government showed Citgo noted, "There is little to no extra room to handle major refinery upsets or a heavy rainfall." This is South Louisiana. It rains a lot.

The fact the facility was under-built was confirmed by August 1995, argues the government, when Citgo made its first of "many"unauthorized multi-million gallon discharges of untreated oily wastewater into the un-permitted 'Surge Pond' adjacent to the Calcasieu River to avoid overflowing the tanks during rain storms that were far below the design rain levels." (United States Remand Brief, Page 15). In October 1995, Citgo's WWTP Unit Supervisor notified management of inadequate storage capacity, failure to implement the design, major operational problems, and a high risk of overflow from the inadequate storage. Citgo's own documents clearly demonstrate the company knew of the problem since the 1994 start up. Consequently, the United States argues May 1994 should be the beginning date for calculating the economic benefit.

Alternatively, the government argues the 1996 date should be used because in October 1996, the WWTP Unit Supervisor and his Area/Department Manager made a formal request to install additional storage capacity, which stated:

> **Description of Problem: Since the [WWTP] was started up in May 1994, several times it has been necessary to divert wastewater to the refinery Surge Pond. These diversions were necessary because of inadequate tankage to contain additional flow as a result of large storm events.**

Additionally, the Fifth Circuit noted, "By 1996, just two years after the facility's completion, a supervisor requested the construction of an additional storage tank, citing the inadequacy of the two existing storage tanks to accommodate stormwater." (Fifth Circuit Opinion, Doc. #245, Page 11). Additionally, the appellate court took strong issue with Citgo "deferring for nearly a decade

its response to the known deficiencies in its Lake Charles plant." (Id., Page 5) Through these statements, it is clear the appellate court recognizes 1996 to be, at the very least, the beginning of the economic benefit, contends the United States.

Finally, with respect to the time period calculations, the government argues the starting date for the delayed aeration tank should be December 2000, the date the improvements were recommended by Mr. Amendola. Further, the dates for avoided costs related to the sludge are the years Citgo stopped removing sludge from the tanks, namely 2000 through 2007. In 2007, the third tank became operational; no other delayed equipment had been built. Additionally, at the time of remand, the injunctive relief was still not satisfied, so the economic benefit is ongoing, says the United States.

The government presents, on remand, an "updated economic benefit calculation" by its expert, Mr. Harris. He concludes the economic benefit, if one uses the 1994 date, is $114.2 million or, if one uses the 1996 date, $91.7 million. The government contends these totals are higher than those at trial to include the timer period through May 2014, the earliest date Citgo could have paid. Also, the cost of the aeration tank was updated and the $2.5 million per year in benefits from avoiding disposal costs, a fact admitted at trial by Citgo, were included. Finally, the actual project completion date was added for recalculation purposes. It is argued he used the same methodology, math, and facts used at trial, so this Court should accept the new totals.

In response, Citgo argues everything set forth by the government is "legally deficient" because it is not the least cost alternative and the government never argued it was until now. Citgo contends the government is seeking to maximize the economic benefit calculation by arguing the 1994/1996 dates, when the spill didn't take place until 2006. Further, the

8

unauthorized wastewater diversions the government relies on are unrelated to the spill and "immaterial to the least cost benefit inquiry." (Citgo Post-Appeal Remand Sur-Reply Brief, Page 2). What is important to this inquiry is the violation at issue, not unrelated activity years earlier. Citgo argues it presented less costly alternatives that the governments at trial and these should be used to calculate the benefit. Specifically, Citgo used the 1995 date on which the new crude unit began operations, increasing wastewater at the facility.

Citgo also assets the government either misunderstood or is mischaracterizing testimony with regard to Citgo's debt and the funding of projects. Further, its expert economist, Mr. Finch, ran several different scenarios, and calculated both the gains and losses of Citgo, whereas the government failed to calculate the cost of capital and the cost of debt. Citgo argues its costs should be considered, including a $13 million criminal fine, $3 million paid to the State of Louisiana, $7 million to comply with the Compliance Plan, and the $30-$40 million it will take to satisfy the injunctive relief. As to the governments' new calculations, the defendant argues this constitutes new evidence and is improper for this Court to consider. Citgo offered its own set of calculations, which fall into the same category.

Additionally, Citgo says the government has mischaracterized its knowledge of the tank contents and Citgo's compliance with the injunctive relief.

As recognized by the Fifth Circuit, the economic benefit to Citgo from failing to take measures to prevent the spill is not an easy task in this case given the extremes in calculations offered by the parties. This Court previously held the true sum lies somewhere between $719 asserted by Citgo and the $83 million initially sought by the government. It is still believed the true number lies somewhere between those offered by the parties, but the need for a more precise

answer is acknowledged.

To that end, this Court finds the calculations and methodology set forth by the United States to be more reasonable and fitting under the facts and circumstances of this case, and the ultimate determination herein leans more toward that end. Taking the elements in order, this Court has determined the "avoided and delayed cost" method will be used to determine the economic benefit. Secondly, the evidence fully supports a finding that certain equipment should have been installed and measures taken earlier to prevent the spill which ultimately occurred. Specifically, the third and fourth wastewater tanks, at least one API separator, and an aeration tank were delayed. As for the avoided items, this Court finds Citgo avoided $2.7 million between the years 2000 and 2007 by failing to remove oily sludge from the wastewater storage tanks and $2.5 million per year in avoided waste disposal costs.

Citgo argues the alternatives proposed by the government are not the "least costly alternative" and should be dismissed as contrary to law. The evidence, however, supports a finding that Citgo knew when it built the facility, or at the very least by 1996, that the storage capacity was inadequate. A review of the evidence clearly shows that Citgo's own supervisors requested additional capacity, citing the likelihood of an incident just like the one that ultimately happened. In Citgo's own documents offered as Exhibit P0503 at CIT0200299, 200303 stated in 1997 that the construction project at the treatment plant had "no monetary payback" and "capital money spent on no-return projects reduces the amount of money that could be spent elsewhere on higher return and more needed projects and repairs." In other words, Citgo chose to keep gambling with the environment even after being put on notice of the grave risks.

This Court has already determined that a Third and Fourth Wastewater Tank were necessary as Citgo lacked the capacity to run its operations. They should have been installed much earlier, as well as the Aeration Tank and API Separator. The appellate court also recognized Citgo's egregiousness in failing to address the recognized deficiencies. For Citgo to argue the least costly alternative was a $719 repair of skimmers and seal of a junction box is absurd and unworthy of discussion. Citgo's alternative calculations also fall short as they fail to utilize the correct time period and do not recognize the extent of the action which should have taken place to avoid this catastrophic scenario. There were numerous root causes which lead to this spill. Citgo took no action to cure any of them.

As evidenced by the massive removal of millions of gallons of polluted wastewater over the years and the notices to Citgo by its own employees and experts about the problems which were likely to lead to a sizeable spill, the least costly alterative to avoid this inevitable disaster would have been to build the facility with enough capacity from the beginning or, at the very least, to have made the necessary improvements in 1996 when Citgo was absolutely put on notice of the deficiencies at this plant and knew un-permitted, polluted wastewater was being improperly removed and stored. **Consequently, it is held the least costly alternative would have been to provide adequate capacity at the time Citgo knew it fell short, which was at least 1996.**

Moving to the third element, a determination of the unit costs can be calculated using the evidence presented at trial and the actual cost evidence offered by the parties. **Specifically, it is held the government is correct in calculating the Third and Fourth Wastewater Tanks cost at $15.65 million each and the API Separator $1.726 million. The Aeration Tank cost is**

11

**determined by this Court to be $5 million, the low end of the $5-6 million identified by Citgo. As noted above, it is held Citgo benefitted economically in the amount of $2.7 million between the years 2000 and 2007 from the failure to remove sludge and $2.5 million per year from 2002 through June of 2007 in avoided waste disposal costs.** These numbers are supported throughout the record of this case and are laid out clearly in the briefing offered by the United States.

We then turn to the question: What is the present value of the delayed and avoided costs? For this determination, a rate of return must be determined. **At trial, this Court specifically stated it found the rate of return that Mr. Harris used, that is 10.04, to be reasonable and acceptable. It is so held today.** As stated in the government's brief, the 10% rate is based on Mr. Harris' approximation of Citgo's weighted average cost of capital (WACC). The use of the WACC rate when determining the present value in an economic benefit analysis is proper and has been endorsed by the EPA in developing its economic benefit model.

The final element explores the economic benefit period. This Court finds no merit in Citgo's argument the economic benefit period should begin in 2005, because the record unquestionably reflects it knew of the problems and risks at the facility well before that time and consciously chose to take no action. Citgo made un-permitted discharges of over 20 million gallons of untreated oily wastewater to the Surge Pond, beginning shortly after operations began in 1994. Additionally, the evidence shows Citgo knew when the facility opened that it was not built to adequate specifications. This Court thought long and hard about whether to begin the economic benefit time period in May 1994. Ultimately, however, the record is clear and completely unambiguous, as discussed heretofore, that Citgo was absolutely aware of the

inadequate capacity, as well as the high risk of an incident such as this, through its own supervisors in October 1996 when the formal request for additional tank capacity was made by the WWTP Unit Supervisor and his Area/Department Manager. **As such, it is held the economic benefit time period will be calculated from October 1996.** The Fifth Circuit has also recognized this as a proper starting point, noting Citgo deferred its response to the "known deficiencies" for "nearly a decade" (Fifth Circuit Ruling, Doc. #245, Page 5).

**The starting date for the economic benefit arising from the delayed aeration tank is hereby set at December 2000 when Mr. Amendola recommended the improvements which, ultimately, were not undertaken by Citgo. As set forth previously, it is held Citgo benefitted economically in the amount of $2.7 million between the years 2000 and 2007 from the failure to remove sludge and $2.5 million per year from 2002 through June of 2007 in avoided waste disposal costs.**

As to the end date, the government argues the benefit period extends essentially to present day, or at least until the summer of 2015, the anticipated completion date of the injunctive relief projects. Citgo, naturally, disagrees. The Court notes the Third Wastwater tank was not operational until a year and a half after the 2006 spill. Additionally, the Fourth Wastewater tank, ordered through injunctive relief in 2011, was not timely built, but is now complete to the best of this Court's knowledge. The failure to timely complete the Fourth Wastewater Tank was, in part, the subject of a Motion to Enforce Judgment filed by the United States which was heard on June 4, 2015. The parties ultimately filed an Agreed Order into the record on July 13, 2015.

**A full consideration of the evidence leads this Court to an acceptance of the end date(s) proposed by the government. In light of the history of delays and avoidance, it is held those proposed dates are reasonable and accurate. As such, it is held the full amount of economic benefit realized by Citgo as a result of the avoidance and delays outlined herein is $91.7 million.**

## **GROSS NEGLIGENCE**

As recognized by the Fifth Circuit, this Court articulated the correct legal standard for gross negligence, but a plain reading of the opinion strongly implies the conclusion reached was incorrect. Specifically, the Court stated, "By finding nothing more than simple negligence, the district court discounted the seriousness of Citgo's multi-year wait before it began taking the corrective measures required at this plant." Upon review of the evidence with a fresh perspective, this Court fully agrees that it erred in its conclusion as to Citgo's level of negligence.

As explained by the appellate court, "'Gross negligence is a label that straddles the divide between intentional and accidental actions." (5th Circuit Opinion, Doc. #245, Page 11). That is, it is a higher degree of negligence, but falls short of being an intentional act. The Louisiana Supreme Court was quoted by the Fifth Circuit as stating, "often [there is] no clear distinction between such willful, wanton, or reckless conduct and 'gross negligence', and the two have tended to merge and take on the same meaning." (Id.).

Citgo began operations at the Lake Charles refinery in 1994. In August 1995, Citgo was forced to make an unauthorized discharge of untreated wastewater into the un-permitted Surge Pond, adjacent to the Calcasieu River. In May 2006, Citgo's supervisor of the WWTP Unit

requested pump replacement. October 1996, Citgo's supervisors formally requested additional capacity due to inadequate space during rain events and brought the risks to those up the chain. In 1997, a Citgo engineer warned, "Since the system is already marginal for stormwater capacity, it is imperative that excess oil and solids be removed so that this capacity can be sued to store stormwater." Citgo took no action to repair the oil-skimming system which would have removed waste oil from the tanks. It also took no action to add additional storage capacity.

Admittedly, Citgo took some alternative actions to removed oil from the tanks, but these methods (such as pumping) were less effective and had been abandoned by 2000. As a result, sludge and waste oil accumulated in the tanks for a minimum of five years before the 2006 spill. As this Court previously found, the storage tanks were "over loaded and should have been addressed prior to the spill." Further, environmental consultants who studied the facility in 2002 recommended the construction of a third storage tank. Citgo failed to begin the project for three years, starting it in 2005, shortly before the spill. It was no completed until 2007, after this incident took place. Over the course of these years, Citgo made unauthorized discharges of over 30 million gallons of untreated wastewater into an un-permitted surge pond, further compounding the risk of environmental impact.

The Fifth Circuit pointed out, "Citgo's own investigation of the spill revealed it had several 'root causes'. First, Citgo's wastewater treatment facility was inadequate to handle stormwater, a fact identified by the 2002 study. Second, Citgo did not have a procedure in place to monitor the amount of waste oil accumulating in the tanks. Third, Citgo failed to remove waste oil and sludge from the tanks on a regular basis." Citgo knew it had impaired storage capacity and it not only failed to construct additional capacity, but it failed to maintain the

limited capacity it had, allowing the tanks to fill with sludge and waste. The sludge accumulated in the tanks for five years before the spill. The evidence demonstrates a main reason behind Citgo's failure to do so was simply to make more money. The evidence further confirmed that Citgo failed to maintain the tanks because the inadequate storage space made it too risky to take any working tank out of service.

Citgo allowed over four million gallons of waste to build up in the tanks before the 2006 spill. Further, Citgo violated its own standard operating procedures by failing to draw down the tank level prior to any rain event. The evidence shows that prior to the June 2006 storm, the tanks were at 17 feet, rather than the 5.5 feet Citgo procedure specified. Citgo further failed to take regular measurements of the amount of waste oil in the tanks. The WWTP Supervisor admitted he had not taken measurements in the entire six and a half years he was there. That is unthinkable. The evidence confirms Citgo chronically failed to take preventative measures, resulting in the spillage of over two million gallons of oil into the waterways surrounding the Lake Charles, Louisiana refinery, closure of the navigation channel for ten days, disruption of local business, restriction of recreational water activities, and a massive impact of the environment, damaging over 100 acres of marsh habitat, and severely impacting local aquatic and wildlife .

Upon a second review of the evidence and arguments presented, this Court could not agree more with the opinion of the Fifth Circuit which stated, "In our view, though, almost winning a highly risky gamble with the environment does not much affect the egregiousness of having been gambling in the first place." **In a state like Louisiana, where heavy rain in a common occurrence, failing to take adequate measures to prevent a tragedy such as this,**

with the knowledge Citgo had in its possession, rises to the level of gross negligence.

**REMAINING PENALTY FACTORS**

This Court previously concluded the 2006 spill was massive, excessive, and a tragedy. This holds true today. The level of seriousness of the violations outlined in this case is the highest, in this Court's opinion. **The appellate court and the parties agreed with the earlier assessment of this factor and the prior findings remain unchanged.**

The second factor, the economic benefit to the violator has been fully discussed above. **The degree of culpability–factor three–does not warrant discussion as Citgo was fully at fault for the incident.** This Court's prior findings on this penalty factor also remain unchanged. **As previously held, Citgo paid a $13 million criminal fine, which does not directly offset any civil fine. It has not paid any other "penalties" for the incident.**

As to a history of prior violations, Citgo's is extensive. Citgo discharged oily wastewater into the surge pond on at least six (6) occasions, totaling more than thirty (30) million gallons. Further, Citgo had over nine hundred and fifty (950) days of permit exceedances, as shown on mandatory disclosures. It was also in violation of its own standard operating procedures, as outlined above. **As previously held, and it is so held today, "Citgo is guilty of prior violations and does not appear to have recognized the importance of compliance, pollution control, environmental responsibility, and the overall duty imposed on businesses to operate safely."**

**With regard to the nature, extent, and degree of success of any efforts of Citgo to minimize or mitigate the effects of the discharge, the appellate court found no clear error or abuse of discretion in this Court's prior findings and they stand unchanged today.** At the height of Citgo's response, it deployed 1,500 people, 60 miles of boom, vacuum trucks, skimmers, and other clean up equipment. The initial response to the spill, however, was slow and lacking. Citgo failed to initially contain the spill, failed to protect workers, and failed to inform the Coast Guard of the true nature of the incident.

Upon consideration of the economic impact of a penalty on Citgo, the Court finds as it did previously, "Citgo is a multi-billion dollar, international company. The Lake Charles Refinery is one of the largest refineries in the United States. The Court also recognizes that a fine should be based on the actions and/or inactions of the violator which led to the violation, and not on the violator's bank account. That is, simply because a violator has a significant amount of money, a Court should not impose a fine that is excessive in light of the violation. **A reasonable civil fine in this case is unlikely to impact Citgo in a negative way."**

**Finally, the appellate court found no error in the prior analysis of factor eight–any other matters as justice may require. The findings contained in the September 2011 Judgment stand.**

**CIVIL PENALTY**

The Court recognizes its error in originally penalizing Citgo only $6 million, the equivalent of approximately one day's profit. Given the seriousness of this incident, the long range impact it had on the environment and Lake Charles area, and all of the factors outlined above, an appropriate penalty belongs in a significantly higher range.

As held before, "...the fair calculation of a penalty in this situation is on a 'per barrel of oil or unit of reportable quantity of hazardous substance discharged' method. 33 U.S.C.A. section 1321(b)(7)(A)." The government took issue with the original finding of 54,000 gallons spilled, relying on Citgo's calculations. However, this court still finds this calculation to be more reasonable and credible, a finding upheld by the Fifth Circuit. Admittedly, penalizing Citgo only $111 per barrel was an error. The Court will employ the same mathematical approach as before, but adjust the penalty amount in light of the foregoing discussions, particularly the finding of gross negligence and the economic impact conclusion.

The government also found fault with the Court's failure to use the "top down" method for calculating the penalty. The appellate court finds both the "top down" and the "bottom up" methods acceptable, noting "This circuit has never held that a particular approach must be followed, and we do not decide otherwise today." The focus of both the appellate court and this district court is making a sound decision with respect to the ultimate civil penalty.

In light of the finding of gross negligence, the Clean Water Act authorizes a penalty enhancement of up to $4,300 per barrel discharged, as compared to the strict liability amount of $1,100 per barrel. 33 U.S.C. section 1321(b)(7)(D). **Upon consideration of the totality of the circumstances and a full analysis of the factors set forth herein, it is held a per barrel**

penalty amount of $1,500.00 per barrel, for 54,000 barrels, is reasonable and adequately addresses the seriousness of this incident. A total penalty of $81 million is hereby imposed against Citgo. All injunctive relief and other findings contained in the September 2011 judgment stand.

THUS DONE and SIGNED on this _23rd_ day of _December_, 2015.

RICHARD T. HAIK, SR., DISTRICT JUDGE